# CHARLESTON

Taylor *v* County Court of Braxton County.

Submitted February 7, 1905.   Decided February 14, 1905.

1. County and Municipal Orders—*Illegal—Burden of Proof.* ·
      When orders for the payment of money, issued by a county court or other municipal corporation are attacked on the ground of illegality, the burden of proof is on the plaintiff.   (p. 172.)

2. County Courts—*Annual Levy—Application of County Funds.*
      The provision of sec. 29 of ch. 39 of the Code, requiring estimates to be made and spread upon the records of county courts before making the annual levy, does not prevent the diversion of the funds raised from the purposes mentioned in an estimate to other proper purposes.·   (p. 171.·

3. COUNTY COURTS—*Application of County Moneys.*

   The laying of a special levy for bridge purposes, by a county court, does not limit its expenditures for such purposes to the amount raised by such special levy, if there are other available funds.   (pp. 172, 173.)

4. COUNTY COURTS—*Orders in Excess of Levy—Proof, Failure of.*

   The records of the settlements made by a sheriff, which do not disclose the dates of the orders paid by him, is not sufficient evidence to establish the fact that certain unpaid orders were issued in excess of the funds at the disposal of the county court at the time they were issued.   (p. 173 )

5. COUNTY COURTS—*Special Levy—Injunction.*

   Collection of a fund levied by a county court will not be enjoined merely because it recites that the money is to be raised to pay indebtedness on account of a certain class of work and for the prosecution of other work of the like kind, although there are, at the time, unpaid orders for that class of work in existence.   (p. 172.)

Appeal from Circuit Court, Braxton County.

Bill by A. L. Taylor and others against the county court of Braxton county and others.   Decree for plaintiffs, and defendant, Tulley, appeals.

*Reversed.*

LINN, BYRNE & HINES and DULIN & FOX, for appellant.
W. E. HAYMOND, for appellees.

POFFENBARGER, JUDGE:

On an appeal from a decree of the circuit court of Braxton county, two questions are presented. The first is whether certain county orders, issued by the county court of said county, for the construction of iron bridges and the substructures thereof, were issued in excess of the levies laid by said county court for the year 1899, and are for that reason invalid. The second is, whether a portion of the levy laid by said county court for the year 1901 is invalid.

On the 13th day of July, 1899, the county court of said county entered into a contract with The Canton Bridge Company, of Canton, Ohio, whereby it undertook to purchase and pay for five iron bridges at the prices of $1,125, $575, $420, $315 and $1,500, respectively, all to be completed on or before the 10th day of December, 1899.   On the 5th day of October, 1899, an order was entered by said court,

awarding to J. V. Tulley, the contract of building abutments
for four of the said bridges at the price of $7.45 per cubic
yard for stone work, one dollar per square yard for excavation for the foundations for the abutments, and $20.00 per
thousand feet for the timber to be used in said foundations.
This order contained this further provision: ''One-half of
said work to be paid out of the county fund levy of 1899,
and the other one-half to be paid out of the county fund
levy of 1900.'' On the 4th day of January, 1900, another
order was made, in all respects like the one entered on the
5th day of October, 1899, except that it provided that all of
the work should be paid for out of the county fund for the
year 1899, and that orders should be issued as the work was
completed. This change was made in order to overcome the
legal objection to the contract, based on the provision for
payment of part of the money, to become due on it, out of
the revenues of a subsequent year. Tulley swears that,
before the first order was entered, he left the court room
and was not present when it was entered, and' that, upon
discovering its form, he applied to the county court to have
it re-entered in accordance with the oral agreement and
understanding. In this he is supported by the testimony of
two members of the county court. This pretention finds
support in the fact that the court had already contracted for
five bridges, while this contract with Tulley was for the
abutments for only four of them. He says the understanding was that he should erect the abutments for the
four bridges and be paid for them out of the levies for the
year 1899, and that he expected to erect the abutments for
the other bridge later on and be paid for it out of the levies
for 1900. Subsequently, he was awarded the contract for
the substructure of the fifth bridge, performed the work and
was allowed an order for it in the year 1901.

Tulley was allowed, on account of his work, on December
16, 1899, the following drafts, expressly made payable out
of the levy for 1899: $71.35, $50.00, $400.00, $300.00,
$300.00, $500.00, $200.00 and $530.42, total $2,351.77. On
April 27, 1900, he was allowed drafts, on the levy of 1899,
payable to himself for $333.18, $250.00, $300.00, $500.00,
$100.00, $100.00, $100.00, and for the use of Amos Bright
& Co. $60.00, for the use of C. D. Weidenhamer $30.00, for

the use of P. J. Berry & Co. $28.17, for the use of C. C.
Hawkins $95.00, for the use of Curtin & Moon $150.00, and
for the use of F. H. Kidd, three drafts for the sum of
$500.00 each, making a total of $3,797.15.   On July 16,
1900, drafts on the levy of 1899 were issued to him, amount-
ing in the aggregate to $2,689.52.   These drafts were given
in payment for his work on the four bridges contemplated
by his first contract.   Those first allowed were on account
of the Taylor Run and Frame Run abutments, those allowed
on April 27, 1900, on account of Old Woman's Run abut-
ments, and those allowed on July 16, 1900, on account of
Mouth of Oil Creek abutments.   Drafts were issued to the
Canton Bridge Company for the contract prices of all the
bridges contracted for, and $3,310.00 of those drafts had
been paid at the time this suit was instituted.   On account
of the drafts issued to Tulley and his assigns, there had been
paid $3,697.64.   Practically all of the unpaid orders, on
account of Tulley's work were held by assignees.   The bill
prayed that the payment of all the unpaid orders on account
of these contracts be enjoined.

The order of the county court made on the 10th day of
July, 1901, laying the levies for county purposes for the
fiscal year commencing on the first day of June, 1901, and
ending on the 31st day of May, 1902, contained this clause:
"The court doth lay a levy of sixteen and two-third cents
on each One Hundred dollars valuation of real estate and
personal property as assessed in this county for the *ensueing*
year for the purpose of paying the indebtedness incurred in
the erection of certain bridges and of erecting certain other
bridges."   The bill charged illegality of this part of the
order on the ground that the money to be raised under it
was to be applied to the payment of the alleged illegal orders
or drafts, issued on account of the alleged illegal contracts
made with The Canton Bridge Company and J. V. Tulley.

The original bill made the county court of Braxton county,
J. V. Tulley, The Canton Bridge Company, F. H. Kidd
and George Goad, sheriff, parties defendant.   The answer
of Tulley having disclosed the assignment of several of the
drafts, the assignees were made parties by an amended bill.
Depositions were taken, the cause was referred to a com-
missioner, and, upon his report, and the documentary evi-

dence returned therewith, and filed with the bill as exhibits, and the depositions taken, the injunction awarded at the institution of the suit prohibiting the collection of the unpaid orders and the collection of the levy for bridge purposes, was perpetuated. And, from the decree, Tulley has appealed.

One ground of the alleged illegality of the drafts issued to Tulley is the form of the order of October, 1899, showing that part of the work was to be paid for out of the levies of a future year. Under the principles announced in *Davis* v. *County Court*, 38 W. Va. 104, and *Handley* v. *County Court*, 50 W. Va. 439, this would invalidate the contract. But we think this defect was cured by the order subsequently entered. The claim of Tulley that it embodies the true contract is not only supported by his testimony and that of other witnesses, but harmonizes with the circumstances as well. That such an amendment may be made is intimated by Judge Holt, in *Honaker* v. *Board of Education*, 42, W. Va. 170. In that case the original contract was for the payment of one-half out of the fund of a subsequent year, but, speaking of the decree of the court below, Judge Holt said: "This could hardly have been the ground on which the circuit court based its decree, for the written contract for the purchase of the charts as amended and finally executed was entered into on the 15th day of July, 1893. One half of the seven hundred and fifty dollars—the purchase money—was to be paid on the 1st of December, 1893, and the other half on the 1st day of April, 1894, and provision was made for payment out of the school levy of the current fiscal year, that day laid by the board." The decree was affirmed upon other grounds. The allowance of the drafts for all this work treated the contract as one payable out of the funds of the year 1899. This was a practical construction of the contract by the parties, antedating the suit to impeach it.

Invalidity of these orders is predicated also upon the charge that, at the times at which the contract was made and the orders issued, the funds in the hands of the court derived from the levies of previous years and levied for the current expenses of that year were insufficient to pay the obligations imposed by the contract. The evidence adduced in support of this claim consists of the record of the settlements made

by the sheriff of the county with the county court for the years, 1897, 1898, 1899 and 1900, showing that the levies for those years, for county purposes and bridge purposes, except a balance of $287.95, had been disbursed. The evidence, of course, precludes the possibility of any undisbursed funds in the hands of the sheriff, sufficient in amount to pay the outstanding orders. From this fact it is argued that the contracts must have been made without sufficient funds in hand and levied to pay the amounts to become due upon them. The commissioner, however, based his report upon a different test. His construction of the decree of reference was that the the inquiry was to extend only to the state of that part of the county fund which had been designated as the bridge fund. He ascertained that there was in the hands of a former sheriff, at the time the contracts were made with the Bridge Company and Tulley, money belonging to that fund which, together with the interest thereon, amounted to $6,010.15, and that the levy for the year 1899 amounted to $2,788.11, making a total of $8,809.26. He then charged up against this amount three old orders issued in the years 1892 and 1893, amounting in the aggregate, principal and interest, to $6,073.26, which he deducted from the $8,809.26 as indebtedness against that fund; leaving an available surplus of $2,736.00, applicable to the contracts made with the Bridge Company and Tulley. This report was excepted to for two reasons; first, because the basis of the statement of the account was wrong, the inquiry having been confined to only a part of the county's funds; and second, because the old orders charged up against the bridge fund were invalid on their faces, it being charged that they had been made payable out of the revenues of years subsequent to the years in which they had been issued. The decree recites that the cause was heard upon the commissioner's report and the exceptions thereto, and argued by counsel, but it does not show that any disposition was made of the exceptions or the report, for they were ignored and the injunction perpetuated. Hence, but for an extract from the opinion of the trial judge given in one of the briefs, it might be assumed that the decree stands, not upon the commissioner's report alone, but upon all the evidence in the case.

The report of the commissioner and the decree stand upon

the erroneous assumption that the only funds applicable to the contracts were those classed by the county court as bridge funds. Section 25 of chapter 43 of the Code authorizes payment of the cost of construction of bridges out of the county treasury and does not require a separate fund to be raised and the expense of bridge construction to be limited to the amount thereof. Section 29 of chapter 39 of the Code, prescribing the mode of laying the annual levy, requires an estimate of the amounts which will probably be required for the expenses of the current year to be made and entered upon the record, but there is no requirement that the funds for the several purposes shall be kept separate and the expenditures for the several purposes limited to the estimated amounts shown. The estimate may be a pre-requisite to a valid levy, it being a safe-guard against extravagance and recklessness in raising money from the people and expending it, but after the funds have been properly levied, they may be used for any proper county purpose. A contemplated improvement may be abandoned, for good cause, or the estimate, though honestly made, may be larger than is necessary, in consequence of which there may be a surplus. Under such circumstances, these funds may unquestionably be used for other purposes. Aside from this, however, there is neither an express nor an implied mandate in the statute that funds properly raised shall be applied to the purposes mentioned in the estimate. Such a requirement would result in great inconvenience, because the exigencies arising from time to time, calling for expenditures of public money, and producing deficits in some estimated funds and excesses in others, are so numerous and impossible of accurate anticipation, that the county court would often find itself with ample means, but, nevertheless, in financial distress. The adequacy of the bridge fund alone to meet the amounts likely to become due on the bridge contracts does not, therefore, support the finding that the orders were illegally issued.

The only other evidence in the record, which might be supposed to do so, is the record of the settlements made by the sheriff for the years, 1897, 1898, 1899 and 1900. This shows that all the funds except the small balance of less than $300.00 have been disbursed; but the dates of none of the drafts

paid appear from this record. Only the aggregate amounts paid and returned by the sheriff are shown. They do not indicate in any way or to any extent the financial condition of the county at the times at which the contracts were made and the drafts issued. Before he can enjoin payment of the orders, the plaintiff must establish their invalidity. The records of the court were open to him. If they have been properly kept, they show the date and amount of every order issued against the levies and funds then at the disposal of the court, and their production would have disclosed the aggregate amount of prior issues, and the condition in prior years could also have been ascertained from the records. Instead of bringing evidence which would have disclosed the status of the fund at the date of the alleged illegal contract, he has come with records which have no bearing upon the vital issue. Hence, he fails to sustain the burden of proof which the law has imposed upon him. *Armstrong* v. *County Court*, 41 W. Va. 602.

Should the collection of the levy for bridge purposes have been enjoined? The order says, on its face, the money is to be used, in part, for the payment of indebtedness. Does this conclusively show the illegality of the purpose for which the money is to be used when raised? Shall it be said that the word indebtedness cannot be a misdescription of the demands which the court intended to satisfy out of the levy? The evidence shows there were outstanding drafts of a former year which the court no doubt intended to pay out of this levy, but they are not necessarily debts in the legal sense of the term. Though it may not be permissible to levy taxes, in one year, to pay drafts drawn in excess of the levies of a former year, as claimed by counsel for the appellee, if the drafts of the former year have not in fact been so overdrawn, but the funds, provided for their payment, have been disbursed in payment of proper drafts upon the funds of a subsequent year, and the funds of the subsequent year, thus left undisbursed upon the drafts of that year, have been absorbed by payment of valid drafts drawn in the third year, and so on, there may be, at all times, outstanding drafts, which constitute an apparent, but not a real, charge on the funds of subsequent years, but payable out of the same because the funds of the previous year have been absorbed

in the payment of valid drafts issued in a subsequent year. If, therefore, these unpaid bridge orders were brought to the attention of the county court at the levy term, 1901, and the reference in the order is to them, as is claimed, the mere designation of them as indebtedness is not necessarily an admission of their illegality, nor does it establish the fact of indebtedness.

The untenableness of the position taken by counsel for the appellee lies in this, that the record of the sheriff's settlement, the only evidence adduced, is palpably uncertain, and therefore, unsatisfactory and inconclusive, evidence of the financial condition of the county at any given date. It shows the date of none of the drafts paid, but, only the aggregate amounts. Thus, the settlements show the following credits for drafts paid out of county and bridge funds: 1897, $8,614.04; 1898, $14,195.01; 1899, $11,230.84; 1900, $18,-710.50. When, and upon what levies, these drafts had been drawn, is in no way indicated by these copies of the records of the settlements. What amount of the orders drawn in 1900 may have been paid out of the levy of 1899, or taken by the sheriff on the taxes for the year 1899, to the displacement of orders which should have been paid out of the levies for 1899, cannot be ascertained from these copies of the record of the sheriff's settlements. Had the dates and the amounts of the orders paid been shown, the evidence would have come up to this point, and would, or would not, have shown that these orders had not been displaced, according to the fact. Will the court supply this defect in the evidence by a presumption? What principle of law demands that? How can it be done in the face of the laxness and want of system in the method of tax collection and disbursement disclosed by the statutes themselves? The sheriff is the collecting and disbursing officer. His place of business is wherever he happens to be,—on the streets, on country roads, in the fence-corners, and on the bridle paths leading up the hollows and over the hills, and his desk is a pair of saddle-bags. He receives and pays out money everywhere without any possible way of keeping funds separate or determining whether he is paying drafts in the order of their issue, and takes county and school orders and drafts in payment of "taxes, county and district levies, militia fines

and officer's fees," under the mandate of the statute. Code, chapter 41 section 16. He is beset on all sides by some holders of orders importuning payment, while others in easier circumstances withhold their orders as a sort of safe investment. How can there be any presumption of regularity in the respect indicated in view of this utter lack of system and regularity, imposed by the law itself?

Another view of this order so limits the reference, however, that it does not necessarily reach the drafts, which the plaintiff seeks to enjoin. In order to make it invalid on the ground that its purpose is to pay them, even if it be conceded that their illegality is established, it must appear that there is no legal indebtedness to which the reference can attach. But an order for $1,745.00 for work completed on June 1, 1901, within the year, was allowed on the next day after the levy was laid. This was in a sense indebtedness. It was a demand for work completed in advance of the levy and there may have been other similar demands, to be satisfied. It is shown, in an attempt to prove the order illegal, that no bridges were built after the levy of 1901, but that does not preclude the intent to built them when the levy was laid. This suit was brought soon after that date and long before the depositions were taken. Procedure with contemplated work in the face of an injunction to cut off the funds for payment would have been an exhibition of extreme temerity and recklessness.

There is no evidence of fraud on the part of the members of the court, the bridge company, or Tulley. The work was probably more expensive in character than was necessary, but it seems to have been well and honestly executed at fair and reasonable prices. The effort to impeach the drafts and the levy order on the ground of bad faith has completely failed and nothing is seriously urged except the matters already disposed of.

It is not necessary, in this case, to construe the constitutional provision, forbidding the creation of public indebtedness except in the manner therein prescribed. Whether an order, issued in excess of the levy actually laid, but within the amount which the court has the power, under the Constitution and statues, to levy, creates a debt, within the meaning of the Constitution, is not decided. Nor does the

case involve the principles declared in *Spillman* v. *Parkersburg*, 35 W. Va. 605, *Davis* v. *County Court*, 38 W. Va. 104, and *Hanly* v. *County Court*, 50 W. Va. 439. The evidence fails to make a case calling for the application of those principles.

For the foregoing reasons, so much of the said decree as in any way relates to, impairs the validity of, or affects, any of the said orders issued to J. V. Tulley or his assignees or the said levy for bridge purposes, will be reversed, and so much of the bill as relates to the said orders and levy will be dismissed with costs to the appellant in the court below as well as in this Court.

*Reversed*