# CHARLESTON

STATE *ex rel.* v. DAVIS, *Sheriff.*

Submitted March 24, 1914. Decided May 5, 1914.

1. MANDAMUS—*Taxation—Payment of Taxes—Availability of Orders.*

   As tax collector, a sheriff, having in his hands, actually or constructively, funds, applicable to the payment thereof, is bound to receive lawfully drawn county and district orders from a tax-payer in satisfaction of his state, county and district taxes, if such orders are due and owned by the tax-payer; and mandamus lies to compel such acceptance. (p. 263). ·

2. TAXATION—*Payment of Taxes—Availability of Orders.*

   That the orders tendered were drawn in a fiscal year prior to that for which the taxes are due, and made payable out of the funds of such previous year, constitutes no ground for refusal to accept them in payment of the taxes. (p. 263).

3. SAME—*Collection and Disbursement—Estimate by County Court.*
    The estimate made by a county court, in accordance with the requirements of §29, ch. 39, and ch. 28A, Code 1913, does not constitute a rule for the guidance of the sheriff in the collection or disbursements of county levies.  (p.263).

4. MANDAMUS—*Discretionary Power to Refuse—Right to Exercise.*
    Discretionary power to refuse the writ of mandamus will not be exercised in a case in which the legal right is clear, substantial and fruitful in benefits, and the plaintiff has done nothing out of which an equitable estoppel or defense in the nature of one can arise.  (p. 263).

(ROBINSON and WILLIAMS, JUDGES, dissenting.)

Error to Circuit Court, Fayette County.

Mandamus by the State, on the relation of the White Oak Fuel Company against T. J. Davis, Sheriff, etc.   Judgment for relator, and defendant brings error.

*Affirmed, and rehearing denied.*

*C. R. Summerfield* and *Fred O. Blue,* for plaintiff in error.

*Dillon & Nuckolls,* for defendant in error.

LYNCH, JUDGE:

By proper writ, the circuit court commanded T. J. Davis, sheriff, to receive, in payment of taxes assessed against the relator, the White Oak Fuel Company, for the year 1913, orders issued by the county court and drawn on the levies of former years.   The orders, five in number, bear date August 24, 1910; May 31, 1911; August 29 and October 22, 1912.   With one exception, they were issued early in the tax years.   Two were drawn on the levies of 1910, the others on the levies of 1912; one on the county poor fund, four on the road fund of Fayetteville district; and all of them were promptly presented for payment to the former sheriff, and by him endorsed "no funds".   Davis, whose term as sheriff began January 1, 1913, declined to accept the orders, when presented to him in payment of taxes on November 26, 1913; because, as he claims, they were drawn on resources from which he had received a sum insufficient to pay the orders owned by the relator, and which, save $300, he had previously applied in discharge of other orders drawn thereon.

This statement clearly brings the case within the principles announced in *State ex rel. v. Melton*, 62 W. Va. 253; unless, as it is claimed, ch. 63, acts 1907 (§29, ch. 39, Code) and §9, ch. 9, acts 1908 (§9, ch. 28A, Code), subsequently enacted, forbid application of the levies of 1913 to payment of orders drawn on and payable out of revenues of other years. It is argued that the chapter and section cited were expressly enacted to avoid the effect of the holding in that case, and thereby to forbid application of the levies of one year to liquidation of indebtedness previously contracted by the county court. But nowhere do counsel direct attention to any definite or express provision thereon; or any other provision, before or since enacted, warranting the inference of any intention to evade the effect of the holding in the Melton case, or to modify the mandate of §16, ch. 41, Code, whereby a sheriff is expressly required to receive, in payment of "taxes, county and district levies, militia fines and officers' fees, any county or school order or draft", then due and payable, and drawn on him pursuant to law, if the person offering the same is then entitled thereto.

It is conceded that all the orders owned by the relator were lawfully drawn, implying of course, as the fact is, that the county court had by levies provided a fund amply sufficient for payment of all orders drawn or that could lawfully be drawn papable out of the levies of those years.

The chapter cited, as does also chapter 28A, prescribes the procedure to be observed by all levying tribunals. Their provisions are explicit, and essentially mandatory. The concession that the relator's orders were lawfully drawn carries with it the implication that the county court, before laying the levies in 1910 and 1912, had performed all the duties thus prescribed. Besides, the record shows nothing to the contrary.

By §9, ch. 9, acts 1908, the county court can not lawfully expended any money or incur any indebtedness not expressly authorized, nor make any contract "the performance of which in whole or in part will involve the expenditure of money in excess of funds legally at the disposal of such tribunal, issue or authorize to be issued any certificate, order or other evidence of indebtedness which can not be paid out of

the levy for the current year or out of the fund against which it is issued''. It declares that members of the levying bodies who violate any of the provisions of the chapter shall be liable in damages to any person prejudiced thereby, and also guilty of a misdemeanor and upon conviction punished by fine and imprisonment, in addition to forfeiture of office.

When condensed, section 8 of the same chapter, cited in argument but for what purpose is not obvious, authorizes a special debt levy not exceeding ten cents on each one hundred dollars valuation of the taxable property of the county or district according to its last assessment, for as many years as may be necessary to pay off any indebtedness incurred prior to January 1, 1908; and provides that, for this purpose, the fund so raised shall be kept separate from other levies, and applied in the order of their dates to the liquidation of such indebtedness. ''If after paying off such debts, or effecting the object of said additional levy or of said special levy, any balance remains of any such funds, the same shall'' be disposed of as provided therein.

None of these provisions prescribe penalties against any person other than members of the levying tribunals. Their manifest object was to protect the subdivisions thus represented against an indebtedness created from year to year in excess of the resources to be derived from each annual levy. They do not contain any provisions prescribing the duties of the sheriff, or imposing any penalties upon him, or forbid compliance by him with the express provisions of the section requiring acceptance of county orders in payment of taxes. His conduct is still regulated by the statutes in force when the Melton case was decided.

In argument some stress was also laid on §9, ch. 30, Code 1913. Having been passed in 1904, it was also in force when the Melton case was decided. It requires the sheriff to keep separate accounts, in the form prescribed by the state tax commissioner, of all taxes received and disbursed by him for state, county, district and school district purposes, so as to show the total receipts and disbursements up to the close of business on each day, and the balance then due from or to him on account of each fund, a statement of which he shall on the following morning file with the clerk of the county

court, who shall post the same immediately in his office until
the next like statement is received and posted, when 'the
former shall be filed and preserved in his office. But, we
repeat, this requirement was in force at the time the Melton
case was decided, and, indeed, in its essential features, since
its enactment in 1904.

But counsel for respondent direct attention to an existing
indebtedness against Fayette county in excess of the resources
derivable from any rate legally leviable on its taxable prop-
erty, and the consequent diversion of the levies for 1913 from
the purposes for which they were laid if the orders owned by
the relator may lawfully be applied in payment of taxes
assessed for that year. But, as this court in the Melton case
elaborately discussed and answered the same argument, based
on a similar condition then said to exist in Kanawha county,
further discussion is deemed unnecessary. We add only that
such condition is so deplorable that any effort to prevent its
recurrence recommends itself to favorable consideration. The
legislature, no doubt, by the drastic enactments to which we
have referred, intended to deter members of levying tribunals
from creating any liability, by contract or by orders, in
excess of the resources derived from annual levies. But
nowhere did it require a sheriff to know, or ascertain by
investigation, whether or not any order duly issued and
presented for payment by the lawful owner was in excess
of levies legally authorized. The county court in this case is
the body legally authorized to lay the levies and draw orders
thereon. Wherein it proceeds unlawfully its members are
liable in damages to any person injured, and amenable to
criminal prosecution. The statutes cited do not prescribe
any regulations for the guidance of the sheriff except as to
the methods of accounting, or in any degree relax the rigid
rule requiring payment of county orders in cash, or, as a cash
equivalent, acceptance in lieu of taxes chargeable to the
owner. His duties are to collect levies when made, and pay
orders when issued by the county court. He is not required,
or permitted, to judge of the lawfulness of orders drawn
against funds in his hands, or to ascertain whether they are
in excess of the levies collectible by him. That duty devolves

solely on the levying tribunal. It, and not the sheriff, assumes the risk and liability imposed by the statutes.

Again, it is said the relator has his remedy under the statute. He may, and, it is contended, must, sue the members of the court to recover the amount of the orders. But, as already stated, when issued, there were funds adequate and available to pay all orders then drawn on the funds against which its orders were also chargeable. The sheriff endorsed them "no funds". The county court had authorized the levy and issued the orders; the owner had presented them for payment. The statute prescribing punishment was not violated at that time. The county court, the sheriff and the relator had done all that could reasonably be required of them. They could do no more. The levies were not even then collectible, except those of 1910-11, on which the order for the smallest amount was drawn. It is therefore apparent, even without respondent's concession, that the orders were valid and lawful when issued. If then thus valid and lawful, what has since occurred to render them invalid and unlawful obligations, unenforceable or ineffectual as charges against any levies or resources out of which they were originally payable? Nothing is averred or proved effecting a change from validity to invalidity. If by orders subsequently issued by the county court, and paid by the predecessor of Davis, the fund against which the relator's valid orders were drawn has been exhausted, the express mandate of the statutory provisions cited was violated when, and not before, that limit was reached. But the sheriff did not, but the county court did, then become amenable to the liability and punishment prescribed by statute. When that condition of invalidity, and consequent liability, arose, the record does not disclose.

While the relator may come within the terms of the statute authorizing any person prejudiced by an over-issue of orders to sue and recover from members of the derelict tribunal, shall he remain remediless if for any reason his action shall prove abortive and thereby fail of relief? Will the county be still permitted to retain the benefit without remunerating him for the loss sustained by the mistake or wilful misconduct of its agents? The legislature surely did not intend enrichment of a county, and consequent impov-

erishment of any of its citizens, by such wrongful conduct on the part of any levying tribunal, the members of which may financially be unable to respond in damages to the extent of the indebtedness said to exist in Fayette county. If the holder of an order may thus be exposed to loss, he must stand. in an attitude of constant suspense and watchfulness, lest the wreckless and improvident county organization may, by over-issue, exhaust the fund on which he relies before the sheriff can with the utmost diligence even begin to collect the levies out of which it is to arise.

Nor does the further argument based on failure of the relator to repeat demands for payment operate to defeat relief in this case. That course might have avoided resort to this writ. But no statute required it to continue from time to time to demand payment; and, if one did so require, there is neither allegation nor proof that relator was not duly persistent in its efforts to obtain payment of its orders. It may therefore be assumed that it did all that sound judgment and business prudence required in order to accomplish that purpose.

Finding no error, we affirm the judgment.

### ON PETITION FOR RE-HEARING.

POFFENBARGER, JUDGE:

The argument against the decision in this case proceeds upon several fallacious propositions, among which are the following:

(1) Legislative intent and purpose to deprive persons rendering services to counties and other municipal divisions and furnishing them materials, of any compensation therefor, or at least any remedy by which to obtain it, in all those instances in which, by some accident or oversight or misconduct of an officer, there has been a failure to make provision for immediate payment thereof; a thing so unnecessary and so far at variance from justice and sound expediency that it cannot well be supposed. It is not in keeping or harmony with principles of common or public honor, and such policy might and likely would be wasteful and, in some cases, calamitous. If every person rendering service or furnishing materials for a county had to keep his eye on the public records

and make his contract with the court at his peril, with knowledge of the rigid enforcement of the regulation, it is easy to perceive cases of imperious necessity which the court could not provide for.

(2) There is an assumption of right in this court to allow a mere unnecessary implication or surmise as to legislative intent to repeal, limit or annul positive and emphatic statutory provisions that conflict with it. Though the statute says in plain terms sheriffs shall pay lawfully drawn county orders, it is said he cannot do so, because the legislature forbade the issuance of orders, for the payment of which sufficient provision has not been made, notwithstanding the orders were lawfully drawn and payable when they were drawn.

(3) A system of statutory law, the provisions of which are directed solely and exclusively against the levying, disbursing and auditing tribunals and their members and officers, are applied, in argument, to the sheriff, the paying officer, as if they were directed to him, notwithstanding such application would make him disobey the statutes which directly, positively, plainly and emphatically prescribe his duties. An analysis or interpretation of statutory provisions involving such a mass of contradiction and absurdity cannot be sound.

The injustice and impolicy of the first proposition and the contradiction and absurdity of the third suffice to condemn them under a well settled rule of interpretation and construction. *Hasson* v. *City of Chester,* 67 W. Va. 278; *Building Association* v. *Sohn,* 54 W. Va. 101; *Dickey* v. *Smith,* 42 W. Va. 805. Equally well established principles overrule the second proposition and command rejection thereof. A statute dealing with one subject is not presumed to have been intended to change the law relating to another, and so strong is the contrary presumption that words in it purporting to work changes in the law of the latter or innovate upon another system of law are always so restrained and limited as to deny such effect to them. *Reeves* v. *Ross,* 62 W. Va. 7; *State* v. *Melton,* 62 W. Va. 253; *Conley & Avis* v. *Coal & Coke Ry. Co.,* 67 W. Va. 129; *Brown* v. *Gates,* 15 W. Va. 131. That proposition involves repeal of existing statutes by implication. It is said the statutes prescribing duties of the sheriff

have been repealed by other statutes prescribing duties of county courts. Repeals cannot be effected in any such slip-shod manner. Repeals by implications are never favored by courts. In other words, every reasonable presumption against intent to repeal a statute by mere implication must be indulged. *State* v. *Enoch,* 26 W. Va. 253; *Forqueran* v. *Donnally,* 7 W. Va. 114; *Conley* v. *Calhoun Co.,* 2 W. Va. 416.

The legislature has power to make county courts and other similar bodies deal justly with the citizen and at the same time prevent the existence of an unreasonable amount of floating indebtedness or any at all. It cannot authorize local municipal indebtedness without a referendum of the proposition to a vote of the people. Const. Art. X. sec. 8. For current expenses, it cannot authorize levies in any one year in excess of 95 cents on each $100.00 of valuation for county purposes other than the support of free schools. Const. Art. X. sec. 7. It has construed these sections as not inhibiting provision for overdrawn orders, sec. 29 of chap. 39 of the Code of 1906, and that construction has been sustained by this court. *Armstrong* v. *County Court,* 41 W. Va. 602; *State* v. *Melton,* 62 W. Va. 253; *Taylor* v. *County Court,* 57 W. Va. 165. Moreover, such provision has been made in advance of the overdrafts, and hence the overdrafts are not debts within the meaning of sec. 8 of Art. X of the Constitution. How can it be, in view of legislative provision for its almost immediate payment, payment out of the levy of the next year? That is not such indebtedness as is contemplated by said sec. 8, for it must have a reasonable interpretation. It is impossible wholly to avoid delay in payment. County Courts must be allowed to await the completion of contracts before paying the amounts due under them, and the collection of their revenues, as well as to provide for accidents, mistakes and other contingencies. The framers of the Constitution never intended this provision to operate in an unreasonable, oppressive or unjust manner. Its purpose was to prevent floating or unprovided for indebtedness, indebtedness not payable, nor capable of being paid, out of such sums as the taxing bodies could raise within the limitation on the power of taxation, prescribed by sec. 7 of Art. X, and the execution of that function need not be attended by

a brood of ridiculous and absurd incidental and minor results or consequences.

Upon these broad lines, the decision in *State* v. *Melton*, involving exactly the question we have under consideration now, was laid down. Since it was rendered, in the year 1907, the legislature has met in regular session three times, and, though it acted upon the subject of county and road levies and the powers of levying bodies and the duties of the sheriff, it has left sec. 16 of chap. 41 of the Code and secs. 38 and 39 of chap. 39 of the Code, prescribing the duties of sheriffs, respecting the payment of county orders and the collection of taxes, altogether unchanged and unmodified, and thus signified its satisfaction with the decision.

The fiscal business of a county or district, like most other financial undertakings, has its two departments, the auditing department and the paying department. In its efforts to prevent local indebtedness in the form of out standing orders, not payable for want of funds actually levied, the legislature has limited its enactments to the auditing end of the subject. It has inhibited, in most emphatic terms, overdrafts by levying and disbursing bodies, fixing penalties both civil and criminal for disregard of the prohibition, but it has left the paying end of the transaction just as it was fixed by the legislature many years ago.

The legislative mandate to the sheriff, in sec. 39 of chap. 39 of the Code, to pay any lawfully drawn county order presented to him and properly endorsed, if he has funds applicable thereto, still stands, together with the provision, in the same section, giving a right of action to the holder of the order against the sheriff and his sureties. Sec. 37 of the same chapter prescribes the form of the order, requiring the signature thereto of the clerk of the court and its president. Sec. 38 of the same chapter inhibits the payment by the sheriff of money out of the county treasury except upon an order signed by the president and the clerk and properly endorsed, or upon a judgment or decree against the county court. Sec. 16 of chap. 41 of the Code expressly requires the sheriff to accept county and school orders in payment of taxes of all kinds, state, county, district and school district. There is but one limitation upon these provisions, namely

that the order must be due and payable and endorsed by the holder. The form of order prescribed does not contemplate the issuance of an order payable at a future date. Its terms make all orders payable upon demand. Sec. 39 of chap. 39 and sec. 16 of chap. 41 contain the phrase "due and payable." Just what this means the statute does not very clearly express. An order cannot in terms be made payable out of a future levy. Such an order is void on its face. *Davis* v. *County Court*, 38 W. Va. 104; *Honaker* v. *Board of Education*, 42 W. Va. 170. Likely the payment of an order might be deferred, by an express direction of the court, to some future time within the fiscal year in which it is drawn, since sec. 37 of chap. 39 says no order shall be rendered invalid by a defect of form, and authorizes the use of a number of modes of specification of purposes for which county orders may be drawn. However this may be, an order is not due and payable, if the sheriff has no funds in his hands, actually or constructively, applicable to the payment thereof; for sec. 39 says the sheriff shall endorse on orders presented to him, under such circumstances, the words "presented for payment," with the date and sign the same, and thus be excused from payment thereof. In such case, the order is obviously due but not payable, but it is nevertheless a valid obligation against the county, for the same section says it shall be payable in such case with legal interest from the date of the endorsement. Since the sheriff is excused from payment and the order is made interest bearing and the statute says it shall be payable with interest, the intent must be to postpone payment to a future levy, if necessary. Sec. 16 of chap. 41 of the Code requires the officers charged with the collection of taxes, county and district levies, militia fines and officers' fees, to receive in payment therefor, at par, any county or school order or draft, drawn on him pursuant to law, which is then due and payable, if the person offering the same in payment is entitled thereto at the time it is so offered, but, if such officer has not in his hands money applicable to the payment of such order, he is not required so to accept it, but only to endorse thereon the amount of taxes, levies, fines or fees held by him against such person, and the fact that he has no money in his hands applicable to the pay-

ment of the balance thereof. The purpose of this endorsement is not very clear. It certainly does not amount to satisfaction of the taxes, for it leaves nothing in the hands of the sheriff by way of satisfaction thereof. He gets no money and has no paper in his hands that he can use as a voucher in his settlement, and he may never see that order again. It may be lost, destroyed or assigned. Its purpose, however, is not important here. The statutory authority of the sheriff or collector to refuse payment or acceptance when he has no money in his hands applicable to the payment of the order, serves the purpose of showing that valid orders are not always payable and to that extent it explains the limitation in the statute, commanding the sheriff to pay orders as presented to him. ·

Lack of funds in the hands of the sheriff to pay an order does not establish its invalidity. In *Armstrong* v. *County Court*, 41 W. Va. 602, Judge BRANNON said: "But, from the mere fact that we find the county court levying for county orders outstanding and unpaid, are we to say they represent indebtedness incurred by the court in violation of the Constitution? Rather should we not presume that they represent indebtedness lawfully incurred? He who alleges their validity must show it, and it is not shown. And may there not be allowances for indebtedness lawfully incurred, and, by reason of a mistake in the estimate of the county court, or larger delinquency than expected, or bankruptcy of a sheriff, or other cause producing an unexpected deficit, no money to pay some of the county orders? Surely they are not to remain forever unpaid. They are valid unpaid obligations of the county court, and it is not unlawful to meet them."

The statutory provisions thus far considered not only justify the sheriff in accepting and regarding as valid any order presented to him, bearing the signature of the president of the county court and the clerk thereof, but commanded him to do so. Of course he would not be required to pay an order known to have been forged or to have been raised, but if he knows the signatures are genuine and has no knowledge of anything to the contrary, or of any infirmity in the order, the statute commands him to do so. Moreover, an order the

issuance of which is authorized by a special order of the
county court and signed by the president and the clerk is
presumptively valid, and he who assails it has the burden of
establishing its invalidity.   *Taylor* v. *County Court,* 57 W.
Va. 165; *Armstrong* v. *County Court,* 41 W. Va. 602; *Davis*
v. *Board of Education,* 28 W. Va. 382.

That valid orders may be outstanding unpaid and unpro-
vided for is shown by sec. 43 of chap. 39 of the Code, giving
the writ of mandamus to compel a county court to provide for
payment of such orders, "by and out of the next county levy
to be made in their county, or show sufficient cause why they
should not be compelled to do so." This section, embraces
those instances in which orders have been presented to the
sheriff without obtaining payment and those in which the
sheriff has evaded such presentation.

The shibboleth of the argument for reversal of the judg-
ment is directly in the teeth of this provision expressly
authorizing a writ of mandamus to compel county courts to
provide by subsequent levies for orders that cannot be paid
because of lack of funds.   Not only may a county order be
paid out of the levies of a subsequent year, but the holder
of an order who has sought payment thereof without avail
may have a writ of mandamus against the county court to
compel it to provide in the next levy for the payment of such
orders.

Moreover, there is no provision in the statute any where
which says in so many words or in effect that an order
drawn in one year cannot be paid out of the levies of the next
year or any subsequent year.   Sec. 9 of chap. 9 of the Acts
of 1908 says nothing of the kind.   That section makes it
unlawful for county courts, boards of education, councils of
municipal corporations or other bodies charged with the ad-
ministration of the fiscal affairs of any county, school dis-
trict or independent district or municipality to incur indebt-
edness or obligations not expressly authorized by law.   It
also forbids such tribunals from making any contracts ex-
press or implied, the performance of which may in whole or in
part involve the expenditure of money in excess of the funds
legally at the disposal of such tribunal, issue or authorize to
be issued any certificate, order or other evidence of indebted-

74 W. Va.

ness which cannot be paid out of the levy of the current year or out of the funds against which it is issued. Not a word in this section says an order shall be made expressly payable out of the levies of the year in which it is drawn or forbids payment of it out of the levy of a subsequent year, if it has not been paid out of the levy of the year in which it was drawn. Not a word in it is directed to the sheriff or paying officer. Its mandate is to the county court or other levying and disbursing tribunal. It only forbids the making of indebtedness by such tribunals and inflicts punishment upon persons disobeying its mandate.

Again secs. 2 and 8 of chap. 9 of the Acts of 1908 undoubtedly contemplate and provide for the payment of county orders out of levies of years subsequent to those in which the orders were drawn. Sec. 8 necessarily implies it, for it says "If any county, or any magisterial district or any school district or any independent school district, or any municipal corporation, having outstanding or unpaid orders on the treasury thereof, or owing other floating indebtedness, for which orders were issued or which indebtedness was incurred previous to the first day of January of the year 1908, the amount whereof is so considerable it is impracticable to discharge the same out of the proceeds of the regular levy, and the county court, or board of education, or common council, as the case may be, deem it inadvisable to submit to the voters of the county, or district, or municipality the question as provided in sec. 5, such county, board or council, may lay a levy in addition to the said regular levy to be called "special debt levy." The levying tribunal is authorized to lay the special levy, only in case the regular levy cannot be made large enough to take care of the outstanding orders. If the regular levy can be made sufficient to provide for them, there is no authority in the levying body to lay the special levy. This necessarily implies that outstanding orders that can be paid out of the regular levy shall be so paid. What else can the language mean?

The argument against the payability of orders out of levies subsequent to the years in which the orders were issued is founded largely upon the alteration of the terms of sec. 29 of chap. 39 of the Code. Formerly that section, in so many

words, required county courts to include in their estimates, made for the purposes of levies, the amount of outstanding unpaid orders on the county treasury. It said the estimate should provide for ''All county debts and liabilities payable during the year, including the probable expenditures for county purposes and the amount outstanding of unpaid orders.'' In saying the county court should make provision for all county debts and liabilities, including outstanding orders, the section treated outstanding orders as debts or liabilities. It was amended by chap. 63 of the Acts of 1907, and, as amended, it omits the words ''the amount of outstanding unpaid orders on the county treasury.'' The argument is that this omission was intended to deny power in the county court to provide for unpaid orders. It has no such effect. The words were dropped out merely because they were deemed unnecessary. They were tautologous. County debts and liabilities included outstanding orders and these words were dropped, because they were deemed useless and unnecessary. An outstanding order, if lawfully drawn, is a county liability, if not a county debt. Some corporate indebtedness is bonded and some is floating, but it is all indebtedness. Nor is all indebtedness unconstitutional indebtedness.

It is just as reasonable and fair to say the legislature left out these words because it deemed them unnecessary, as it is to say they were left out because the legislature did not intend provision to be for outstanding orders. The later act, chap. 9 of the Acts of 1908, plainly shows the legislature omitted the words for the former reason, for it necessarily and expressly recognizes right in the county court to pay outstanding orders out of future levies, as has been shown. If the Act of 1907 was intended to omit provision for outstanding orders, it was amended by implication by chap. 9 of the Acts of 1908, an independent act, one not expressly amendatory of any other statute. Sec. 8 of the act, as has been shown, vests power in the county courts to provide, in the regular levy, for outstanding orders, and makes it their duty to do so, when it is practicable, and sec. 2 authorizes inclusion in the estimate of the amount necessary to pay them. That section says the estimates shall include the debts and demands owed by the county as a whole and the debts and demands

payable out of the road or other funds of any district thereof, including debts and demands that will become due and payable during the year by the county as a whole or out of the funds of any district thereof, including interest upon the indebtedness, funded or bonded or otherwise. This does not, in terms, limit the indebtedness and demands to be provided . for, to bonded indebtedness or any particular form of indebtedness. It commands the court to make provision for such debts and demands as are owed by the county, no matter what their form, and, if there could be any doubt about the meaning of the terms, sec. 8 makes them plain by the necessarily implied, if not express, command to provide for all such outstanding orders in the regular levy, if it can be done. That section speaks directly of outstanding orders drawn prior to January 1st, 1908, it is true, but read in connection with section 2, it shows outstanding orders are "debts and demands," and the latter section has no limitation restricting its operation to the orders of any particular year or years.

Sec. 9 of chap. 9 of the Acts of 1908 must be read and interpreted in the light of other statutory provisions to which reference has been made. Remembering that they do not forbid the payment of orders made in one year, out of the levies of subsequent years, but, on the contrary, both authorize and command provision therefor in the levies of subsequent years, it is to be noticed that sec. 9 does not any where say an overdrawn order shall not be paid by the sheriff, nor be provided for in a future levy. It makes it unlawful for any levying and disbursing body to expend any money or incur any obligation or indebtedness it is not expressly authorized by law to expend or incur. It then says "Nor shall any such tribunal make any contract, express or implied, the performance of which in whole or in part, would involve the expenditure of money in excess of funds legally at the disposal of such tribunal, issue or authorize to be issued any certificate, order or other evidence of indebtedness which cannot be paid out of the levy for the current year or out of the funds against which it is issued." This provision inhibits such acts by these tribunals. It makes it unlawful for them to do certain acts. But it does not say the orders issued in viola-

tion of the act shall not be paid. It says an order shall not be issued, that cannot be paid out of the levy or out of the funds against which it is issued, but this falls far short of saying such orders shall not be paid. It means that an order shall not be drawn on a fund if it is insufficient for the payment thereof. This is the litteral import of the words used. In the absence of a constitutional limitation upon the powers of the legislature, that body certainly has the power to make it unlawful to issue an order and at the same time make the order a valid obligation. It may direct its restrictive powers against the person or tribunal and inflict penalties upon him for the issuance of such orders, without making the orders. invalid, and that is what the legislature has attempted to do, for nowhere has it said an overdrawn order shall be invalid. It merely inhibits the issuance of that kind of orders, and at the same time makes provision, as we have shown, for their payment, in secs. 2 and 8 of chap. 9 of Acts 1908 and sec. 43 of chap. 39 of the Code.

The second clause of sec. 9 of chap. 9 of the Acts of 1908, in its terms, harmonizes with this view. It says if any member of any such tribunal shall expend any money, or incur any debt or obligation, or make or participate in the making of any such contract, or be a party thereto in any official capacity, or issue or cause to be issued any such certificate or order or other evidence of indebtedness, he shall be personally liable therefor to the state, or any county or any municipal corporation, district or person prejudiced thereby. How can the county be prejudiced thereby, if the order cannot be paid? How can the tribunal incur any debt or obligations, if its act is wholly void?

This section makes certain acts unlawful. For what purpose? How far unlawful? The purpose is apparent. It is the prevention of floating indebtedness, even though it may not be invalid by reason of the constitutional limitations. It is desirable to have the public business done practically on a cash basis or as nearly so as may be practicable, even though the constitution may not require it. Having the power to declare the particular, acts unlawful, the legislature could make them unlawful in the general and unlimited sense, that is for all purposes and in every way, or only partially and to a

limited extent. It could say they should be unlawful so far and only so far as to form a basis for punishment of the offenders, and not far enough to inflict injury upon innocent persons or embarrassment upon other innocent officers in the discharge of their duties, such as the sheriff. Taking its own words, rather than surmises and guesses, as constituting the true index to its intent, we have the results above declared. The act of overdrawing orders is made unlawful and the actor guilty of a criminal offense and civilly liable for the overdrafts, to the end that overdrawing may cease and the public business be placed more nearly on a cash basis; but the orders are validated, to the extent of the legislative power to validate them, to the end that the innocent citizen dealing with the court may not suffer loss and that confusion, chaos and peril may not reign in the sheriff's office.

The orders involved here, however, are not even overdrawn orders. At the dates of the issuance thereof, the funds on which they were drawn had not been exhausted. The contention is that, though lawfully drawn and admittedly valid, when first presented to the sheriff and endorsed, they cannot be paid, because the fund against which they were drawn has been consumed by overdrafts subsequently or previously made, and the sheriff cannot pay them, though he has money of the department to which they belong, derived from the levies of subsequent years, and the county court cannot provide for their payment, and the holder must await legislative provision for their payment, which may never happen and which he cannot enforce, and all this in the face of sec. 43 of chap. 39 of the Code, giving the holder the writ of mandamus to compel the county court to provide for their payment "by and out of the next county levy to be made in their county."

To deprive the holder of these orders of the benefit thereof by reason of his failure to stand in line at the sheriff's office and insist upon payment, until it was made, and invoke legal remedies against others to prevent exhaustion of the money then in hand, would be a species of repudiation, abhorrent to every sense of justice and fairness in financial transactions, for the legislature might never provide for their payment. There is no means of compelling it to do so. To hold that

such repudiation was intended with the statutes before us, expressing intent to give the holder a remedy against the county court and commanding that body to make provision for the orders, without waiting for process against it, would be a most remarkable proceeding on our part.

Such a violation of the rules of interpretation is not necessary to the effectuation of the laudable purpose of the legislature to terminate the reprehensible practice of overdrawing. The enforcement of the provisions of sec. 9 of chap. 9 of the Acts of 1908 will quickly and effectually break it up. The members of county courts guilty of such conduct can be indicted and, on conviction, removed from office. Likely they can be removed for malfeasance without indictment on proof of the fact. They may be enjoined from over drawing. The statute so provides. If, in any proceeding, such as injunction, mandamus or prohibition, the fact is established, there may be a judgment of amotion. After they have been removed, if not before, the county court may sue them personally for the amounts of overdrawn orders paid and strip them of their property. Our decision neither destroys nor impairs any of these remedies. We are not repealing nor invalidating any of the work of the legislature, having for its purpose the elimination of overdrafts. We are merely giving effect to the statutes as they are written, after having read and considered them altogether, as we are required to do by reason and authority.

The suggestion that the reception of county and road orders in payment of school taxes amounts to payment of school money out of the treasury, without an order, in violation of the statute, is hardly worthy of notice. It is nothing more than a method of collection of school money. Theoretically, if not practically, the county order so taken is put into the county treasury and money equal to the school taxes it represents taken out and placed in the school district treasury.

*Affirmed and rehearing denied.*

WILLIAMS, JUDGE *(dissenting)*:

I am unable to concur in the majority opinion. Legislation subsequent to the decision in the Melton case (62 W. Va. 253) has, in my opinion, limited, by necessary implication,

the application of Serial Section 1651, Code 1913, as the section was construed by that decision, and, therefore, that case does not determine the present one. Chapter 63, Acts 1907, and sections 8 and 9 of chapter 9, Acts of Extra Session 1908, are repugnant to section 16, chapter 41, Code, and necessarily restrict its application. These subsequent acts were designed to prevent the evil of overdrafts by county courts and other tax levying bodies and, properly construed, I think they effectually do so. The legislative purpose is clearly apparent from a number of provisions in the acts referred to. In the first place chapter 63, Acts 1907, amending and re-enacting section 29, Chapter 39, Code, relating to county levies, authorizes the county court to make up an estimate of the amount necessary to be levied for the current fiscal year, and leaves out of the budget "the amount outstanding of unpaid orders on the county treasury," which the section theretofore contained. This item was purposely omitted, because there is another provision in the same act relating to outstanding indebtedness, authorizing a special levy of ten cents to be designated "a special levy for the payment of outstanding indebtedness." This special levy is expressly made applicable to outstanding indebtedness, and is not to be levied for any more years than are necessary to pay debts outstanding when the act took effect. The act made it unlawful thereafter to create a debt, or issue an order, that could not be paid out of the levy of the fund against which it was drawn. The clerk of the county court was required to correctly audit all the outstanding indebtedness, before the court could make the special levy. The purpose of the act was twofold: First, to provide for the payment of existing debts out of the fund to be raised by special levy and to prevent their payment out of the current expense fund derivable from the general levy; and second, to prevent overdrafts in the future. The legislative purpose is made still plainer, if possible, by another and independent act passed the following year, which is an act to regulate the manner of laying levies for taxes, and related not only to county courts, but to all other tax levying bodies in the county, including municipal corporations. I refer to chapter 9, Acts Extra Session 1908. Section 8 of that act authorizes such levying bodies to lay a

"special debt levy" not exceeding ten cents on the $100 of
valuation of property in any year for payment of debts, and
to continue such levy for as many years as may be necessary
to pay off the debts but not longer. The fund provided by
such levy could be applied for no other purpose than that
for which it was levied, except in case there was a surplus
after paying the debts, the application of which was also
expressly provided for. The act provides that, "the treasurer
of each of such funds shall keep an accurate account of the
same separately from other funds." Section 9 makes it un-
lawful for any such levying body to contract a debt or issue
an order of indebtedness "which can not be paid out of the
levy for the current year or out of the fund against which it
is issued," and makes the members of the levying body,
whether county court, school board or municipal council,
violating this section personally liable for the debt, and makes
the violation a misdemeanor for which forfeiture of office, a
fine or imprisonment in jail, or both fine and imprisonment
are imposed. The sheriff, as well as everybody else, is bound
to know the law, and in view of these acts it is easy for him
to determine whether an order, presented to him for payment,
is lawful or unlawful. If the order shows upon its face, as the
orders in this case do, that it was drawn upon funds levied for
a previous year, and the sheriff had no funds in his hands car-
ried over from that year applicable to its payment, then it be-
comes unlawful for him to pay it although it may have been
lawful when drawn. In this case there was no special debt
levy, and there being no fund carried over from a previous
year applicable to the payment of the orders, the sheriff was
justified in refusing payment of them. In so far as section 16,
chapter 41, Code, directs the sheriff to accept orders drawn
upon funds levied in a previous year, in payment of taxes
levied for current expenses, it is repugnant to chapter 63, Acts
1907, and chapter 9, Acts 1908, and is repealed by necessary
implication. County courts are governmental agencies, and
the rule is well settled that he who deals with such agency
is bound to take notice of its authority. The holder of the
drafts must have known that they could not lawfully be
paid out of the funds provided for current expenses of the
fiscal year 1913-14.

Sec. 16, Ch. 41, is also inconsistent with Sec. 140, Ch. 45, Code, which reads: "If any sheriff shall pay out in any one year more money on account of the teachers' fund, the building fund, or any other school fund, than shall have been levied and could have been collected by him during said year, together with the amount remaining in his hands from any preceding year, he shall in such settlement receive no credits for such excess." Regardless of the amount of outstanding overdrawn orders in the hands of the tax-payers, and regardless of whether they are drawn on the county fund, district road fund or school fund, they must be received in payment of taxes levied for any and all purposes, according to Sec. 16, Ch. 41. Suppose the county and road orders paid in that manner should consume a material part of the school fund, how is the sheriff to get credit in his settlement with the board of education for the school fund thus disbursed? Sec. 16, Ch. 41, makes no exception, but requires the collector to receive, at par, any and all county and school orders to which the tax-payer is entitled at the time they are offered, in payment of his taxes levied for all purposes. Every time a sheriff would receive a county order in payment of a tax-payer's taxes he would be disbursing money belonging to the school fund to the amount assessed against such tax-payer for school purposes, and he would have no voucher therefor wherewith to obtain credit in his settlement with the school board. It has been suggested that the sheriff could replace the school fund with county fund, that it is only a matter of bookkeeping, but this does not answer my objection for I am assuming a case where the outstanding orders exhaust the funds. This argument shows that section 16, chapter 41, can have only a limited effect since the act of 1908, it can apply only to orders issued in payment of current expenses, such as were provided for in the levy.

Sec. 39, Ch. 39, Code, harmonizes with Ch. 63, Acts 1907, and Ch. 9, Acts 1908. The sheriff and his bondsmen are made liable by that statute for his refusing to pay an order, only *when he has funds to pay the same,* and if he has no funds derived from a special debt levy and none carried over from a previous year, then section 39 does not apply. In such case the sheriff would know that all the funds he

would handle in the year in which the draft was presented were levied for current expenses, and not to pay outstanding orders of former years. In so far as Sec. 43, Ch. 39, Code, gives the holder of an overdrawn and unpaid order a remedy by mandamus to compel the county court to provide for its payment by a future levy, it is likewise repealed by necessary implication. Because it is in direct conflict with the whole scheme and purpose of chapter 9, Acts 1908. When two acts are inconsistent the latest is of course the law. That the two acts are inconsistent seems to me too plain to merit discussion. It would be vain and useless to enact a statute, as the legislature has done, making it unlawful to issue orders on the county treasury, when no funds have been provided for their payment, if the county court could be compelled to provide for their payment. Moreover, the remedy given against the individual members of the court would be abortive. For the creditor would always apply for the writ to compel the laying of a levy, rather than pursue the more uncertain remedy of suing the individual members of the court. How then would the liability placed on the members of the county court by section 9, Ch. 9, Acts 1908, ever be enforced? Who would be sufficiently interested to sue them after a public tax was laid to pay the debt? Only those who are prejudiced by the action of the court are authorized to sue them, and who could be prejudiced by payment of the debt in that manner? If the order was a just obligation upon the county, which it was bound in any event to pay, certainly neither the county nor its tax-payers could be prejudiced, unless payment of a just debt works a prejudice to the debtor, which is inconceiveable. Then no one would be in a position to sue. But if, as I conceive the law to be, the debt is unlawful and its payment out of the public revenues is forbidden because it was created without authority, then any debtor who failed to receive payment of his draft would be prejudiced, and would have a right of action against the individual members of the county court. That the orders in this case were not shown to have been unlawful when drawn, furnishes no reason for their payment out of funds levied for current expenses. If those particular orders were not illegally drawn, others were, and the illegal orders exhausted the

funds which had been provided for the current expenses
of the fiscal year in which they were issued. In such case
the holder of a lawfully issued order is prejudiced by the
unlawful ones which have supplanted his and exhausted the
fund, and he is expressly given a remedy against the members
of the county court. It might be difficult, perhaps impossible,
to determine what particular orders were unlawfully drawn;
the overdrawing is the *malum prohibitum,* and the holders
of unpaid orders, after the funds are exhausted, whether
lawfully or unlawfully drawn, are the ones who are preju-
diced. I can not conceive that the legislature meant to for-
bid the county court to create a public debt, or overdraw
its funds, and at the same time make such debt or overdraft
payable out of the public treasury. That would be to create
a legal paradox, for it would make the act of the county court
both lawful and unlawful at the same time, a lawful debt
created unlawfully. It would be to allow a subordinate
municipal body to create a valid and binding public obliga-
tion by violating the express command of the legislature,
a doctrine subversive of the basic principle respecting dele-
gated power.

The evil consequences of the majority decision will, I think,
be far reaching. It nullifies, in a great degree, the patient
work of years of the Legislature in enacting a system of laws
designed to produce uniformity in the management of the
fiscal affairs throughout the counties of the State and to pre-
vent reckless expenditures of the public revenues. It allows
funds provided for current expenses to be diverted to the pay-
ment of debts created in violation of law, and may leave
counties without funds to pay their officers and the districts
without funds to carry on their schools.

Ample provision was made by Ch. 9, Acts 1908, for the
payment of all floating indebtedness of the counties, districts
and municipalities, outstanding prior to 1st January, 1908,
and the act expressly prohibits the creation of any such
indebtedness thereafter. Any person dealing with the county
court is bound to take knowledge of its authority. The legis-
lative intent is plainly expressed and should be given effect.
The refusal to pay a debt, created in violation of law, is not

repudiation, but is legitimate governmental protection to taxpayers.

I think the sheriff properly refused payment of the orders and would therefore refuse the writ. In this dissenting opinion Judge Robinson joins.